AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
A Lenovo Desktop Computer, black and grey in color,
containing serial number ES13460294, as further described
in Attachment A-1 ("Computer")

)
)
)
)
)
)

Case No. 1:20-MJ-00242

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 924(a)(1)(A) | False Statements in Required Records |
| 18 U.S.C. § 1001 | False Statements to the Government |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Stephen Tastle, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Mar 16, 2020**

City and state: Cincinnati, Ohio



_____
*Judge's signature*

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A-1**
**Property to Be Searched**

The Property to be Searched is a Lenovo Desktop Computer, black in color, with serial number ES13460294, and the physical and digital contents thereof, which was voluntarily surrendered to the Bureau of Alcohol, Tobacco, Firearms, and Explosives by the Village of Addyston, Ohio, and is presently in the custody of the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. A photograph is provided below.

 

**ATTACHMENT B-1**
**Particular Things to be Seized**

Special Agent Stephen Tastle, assisted by any Federal, State or local law enforcement agencies deemed necessary, is authorized to search for and seize the following items contained in the Property to be Searched, described in Attachment A-1, relating in any manner to or as evidence, instrumentalities, or fruits of violations of 18 U.S.C §§ 371 (conspiracy), 924(a)(1)(A) (false statements in records related to firearms), and 1001 (false statements to the government).

**Definitions**

**Document**" or "**Record**" means every writing or record of whatever type or description, including but not limited to any material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form, including but not limited to emails, text messages, memoranda, letters, forms, reports, notations of any sort of conversations, messages, pictures, videos, voice recordings, voicemail, calendars, date books, call logs, and chat logs, including their metadata and any deleted but recoverable electronic files.

"**Communication**" means any transmission or exchange of information between two or more persons orally, in writing, or electronically and includes, without limitations, any conversation or discussion, whether face-to-face or by means of telephone, electronic (including email, text messaging, instant messaging, social media messaging, direct messaging), or other media, whether by chance or by design.

**Items to be Seized**

The Items to be Seized are the following items, regardless of whether found in physical or digital form:

1

1. Any and all records relating to purchases, sales, transfers, repairs, loans, demonstrations, and any other transactions involving machine guns[5], including but not limited to:

   a. Copies of all acquisition and disposition records to include make, model, serial numbers, caliber of machine guns and associated paperwork to include, but not limited to law letters, repair letters, gunsmith requests and ATF Forms of the transferred machine guns.

   b. Copies of all letters requesting demonstration of machine guns

   c. Copies of all invoices, purchase orders, sales receipts, and/or journal entries

   d. Copies of all shipping invoices, bills of lading, and/or inventory records

   e. Documentation of all payment remittances including negotiated checks, debit memos, credit card identifications, money orders, wire transfers, cash receipts, other items of value (to include firearms, ammunition, etc) or other supporting receipt/disbursement journal entries

   f. Communications and records of communications relating to any purchases, sales, transfers, repairs, loans, demonstrations, and any other transactions involving machine guns

   g. Calendars, diaries, or other records relating to the demonstration of machine guns

   h. Records that are or relate to budgets, ledgers, financing authority, plans, policies, or approvals for purchases of machine guns

   i. Records relating to the proceeds of sales of machine guns

2. Any and all communications and records of communications to, from, or involving any current or former supervisors, managers, officers, or employees of the Addyston Police Department (including part-time or reserve officers and employees) with or relating to the following:

   a. Machine guns

   b. Johnathan Paul Marcum, and any entities related to Marcum, including but not limited to Marcum Firearms, Marcum Manufacturing, and Police Supply Armory

   c. Christopher William Petty, and any entities related to Petty, including but not limited to Tri-State Guns and Customs Works and Tri State Firearms LLC

---

[5] Machine guns are "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 27 C.F.R. § 479.11.

    d.  U.S. Bureau of Alcohol Tobacco Firearms and Explosives

    e.  Heckler and Koch Firearms (H&K)

    f.  FN America LLC (FNH USA/FN)

    g.  Mark Nylen

    h.  Clyde's Armory

3. Any and all records relating to any and all financial transactions, cash, gifts and donations of anything of value to, from, or involving the following:

    a.  Johnathan Paul Marcum, and any entities related to Marcum, including but not limited to Marcum Firearms, Marcum Manufacturing, and Police Supply Armory

    b.  Christopher William Petty, and any entities related to Petty, including but not limited to Tri-State Guns and Customs Works and Tri State Firearms LLC

4. Any and all records relating to cash, gifts, and donations of anything of value from Dorian Lacourse.

5. Any and all records relating to "petty cash" or other cash maintained on-hand at the Addyston Police Department.

6. Evidence of user attribution showing who used or owned the Property to be Searched described in Attachment A-1 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** **A Lenovo Desktop Computer, black and grey in color, containing serial number ES13460294, as further described in Attachment A-1 ("Computer");** | **CASE NO.** <u>1:20-MJ-00242</u> **Magistrate Judge Bowman** **FILED UNDER SEAL** |

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Stephen Tastle, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION**</u>

1.      **Introduction.**  I make this Affidavit in support of an Application for three (3) Search Warrants associated with the following items (collectively the **"Subject Property"**):

        a.      A **Lenovo Desktop Computer**, black and grey in color, containing serial number ES13460294, as further described in Attachment A-1 (**"Computer"**);

        b.      A **locked locker**, grey in color, formerly assigned to Chief Dorian LaCourse, number 83, located inside the Addyston Police Department, 235 Main Street, Addyston, Ohio, as further described in Attachment A-2 (**"Locker"**); and

        c.      A **locked container** in the office of former Chief Dorian LaCourse, located inside the Addyston Police Department, 235 Main Street, Addyston, Ohio, as further described in Attachment A-3 (**"Container"**),

and to seize evidence, instrumentalities, and fruits of violations of 18 U.S.C §§ 371 (conspiracy), 924(a)(1)(A) (false statements in records related to firearms), and 1001 (false statements to the government) contained physically or digitally in or on the Subject Property, as further described in Attachments B-1 through B-3.

1

2.     **Your Affiant.**   Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and has been since October 2015.   Your Affiant is currently assigned to the Indianapolis Field Office. Prior to the ATF, I was employed as a Special Agent with the United States Secret Service for seven years.   As a Special Agent with the ATF, your Affiant has received formal law enforcement and investigative training at the Federal Law Enforcement Training Center ("FLETC").   For the purpose of applying for this criminal complaint and arrest warrant, I am a federal law enforcement officer under the applicable provisions of the United States Code and under Rule 41(a) of the Federal Rules of Criminal Procedure and empowered under the laws of the United States to investigate violations of federal firearms laws pertaining to the Gun Control Act (GCA) and the National Firearms Act (NFA).   Specifically, your Affiant is an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.

3.     **Sources of Information.**   The information contained in this Affidavit is based on my personal knowledge, training, and experience, information that I have received from other law enforcement officers assisting in this investigation and what I have learned from the other sources specifically discussed herein.   This Affidavit does not purport to set forth all of my knowledge or investigation into this case but only that which I believe is sufficient to establish probable cause as to the criminal violations described herein and the locations to be searched and evidence to be seized.

4.     **Consent and Abundance of Caution.**

2

a.       The Subject Property is owned by the Village of Addyston, Ohio, and specifically its Police Department.  The Village of Addyston has provided consent to search each of the Subject Property.

b.       Nevertheless, this Application for Warrants to search the Subject Property is made in an abundance of caution and in the event that a third-party in the future claims a privacy interest in the Subject Property.

## RELEVANT CRIMINAL STATUTES

5.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Subject Property contains evidence and fruits of, and/or were themselves instrumentalities used to commit, violations of federal law, including the following statutes, which each require proof of the following elements:

6.       **18 U.S.C. § 371 (Conspiracy), to violate 18 U.S.C. §§ 924(a)(1)(A) and 1001**

FIRST:       The conspiracy as alleged existed;

SECOND:  The defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and

THIRD:       One of the conspirators committed an overt act in an effort to advance the goals of the conspiracy.

7.       **18 U.S.C. § 924(a)(1)(A) (False Statements in Required Records)**

FIRST:       The defendant made a false statement or representation to a federal firearms licensee;

SECOND:  With respect to the information required to be kept in the records of a federal firearms licensee, such as ATF Forms 5 and 6; and

THIRD:       The defendant acted knowingly.

8.       **18 U.S.C. § 1001 (False Statements to the Government)**

3

FIRST:      The defendant made a false, fictitious, or fraudulent statement or made or used a false writing or document to the ATF;

SECOND:   In a matter within the ATF's jurisdiction;

THIRD:     The defendant knew the statement, writing, or document was false when made;

FOURTH:   The false, fictitious, or fraudulent statement or false writing or document was material; and

FIFTH:      The defendant acted knowingly and willfully.

4

**PROBABLE CAUSE**

**A.**   **Overview**

9.      There is probable cause that Johnathan MARCUM and Christopher PETTY, two federal firearms licensees located in Franklin and Dearborn Counties, Indiana (respectively), conspired with Dorian LACOURSE, the Chief of Police for Addyston, Ohio, to submit false records to firearms manufacturers and to the ATF for the purpose of importing and domestically acquiring machine guns (automatic weapons) and re-selling them on the secondary market at a profit.

10.      The conspirators sought to take advantage of two exceptions to the general prohibition on possessing and importing machine guns manufactured after 1986.  Specifically, the evidence shows that LACOURSE provided dozens of pieces of documentation to MARCUM and PETTY, who were registered firearms dealers[1] located in the Southern District of Indiana, that falsely claimed that the Addyston Police Department either (a) intended to import and purchase particular machine guns for itself, or (b) that the Department intended to see a demonstration of a particular machine gun that would be obtained as a sample by registered dealer, i.e., MARCUM or PETTY.  The documentation was sent to machine gun manufacturers and to the ATF to effectuate the importation and acquisition of the machine guns, including documentation required by law to be kept by a dealer or manufacturer or to be submitted to ATF to effectuate an importation or transfer of a machine gun.  In reality, as the conspirators well knew, LACOURSE intended his Department to purchase or see a demonstration of few, if any, machine guns.  Instead, the purpose

---

[1]      Not all registered firearms dealers can possess and sell machine guns.  Additional regulatory approval is required.  For purposes of this Affidavit, the term "registered dealer" or "federal firearms licensee" refers only to those dealers who have obtained additional approvals, namely dealers who have paid the special (occupational) tax in order to engage in the business of manufacturing, dealing in, or importing National Firearms Act Firearms (to include machine guns).

5

of the documentation was to allow MARCUM and PETTY to acquire numerous machine guns and then re-sell them to other registered dealers at a profit—which they shared with LACOURSE.

11.     In total, between approximately February 6, 2015 and May 4, 2019, the evidence shows that LACOURSE issued over 45 pieces of documentation on Addyston Police Department letterhead that resulted in MARCUM and PETTY importing, acquiring or affecting the transfer of approximately 240 machine guns. Of these, approximately 130 were subsequently re-sold to other registered dealers throughout the United States at a substantial profit to MARCUM, and, to a lesser extent, PETTY. During this time period, MARCUM and PETTY paid LACOURSE over $10,000.00 in connection with their unlawful importation and acquisition of machine guns.

12.     Specifically relevant to the Subject Property herein, the evidence further shows that LACOURSE communicated with MARCUM and PETTY via email, phone, and text message. Additionally, the investigation to date has shown that evidence of the crimes committed by LACOURSE, MARCUM, and PETTY has been located in the Addyston Police Department and specifically in or around the office of former Police Chief LACOURSE.

## B.     Relevant Individuals and Entities

13.     **Johnathan MARCUM** was a resident of Laurel, Indiana, which is in Franklin County, Indiana, in the Southern District of Indiana. MARCUM owned businesses, including Marcum Firearms, Marcum MFG (Manufacturing), and Police Supply Armory. ATF records show that MARCUM and companies he owned and controlled held at least four federal firearms licenses that allowed the possession, transfer, and importation of machine guns (assuming other regulatory requirements were met).

14.     **Christopher PETTY** was a resident of Lawrenceburg, Indiana, which is in Dearborn County, Indiana, in the Southern District of Indiana. PETTY owned businesses,

including Tri State Firearms and Tri-State Guns and Custom Works.  ATF records show that PETTY and companies he owned and controlled held at least two federal firearms licenses that allowed the possession, transfer, and importation of machine guns (assuming other regulatory requirements were met).

15.    **Dorian LACOURSE** was the Chief of Police for the Addyston Police Department ("APD").  The village of Addyston, Ohio is located on the Ohio River approximately 10 miles from the Indiana-Ohio state line.  It has approximately 1,000 residents.  APD was staffed with between approximately five and ten part-time police officers, with LACOURSE being the only full-time officer.

### C.    <u>Federal Law Concerning Machine Guns</u>[2]

16.    Machine guns are "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); *see also* 27 C.F.R. § 479.11.   It is generally unlawful to possess, transfer, or import a machine gun manufactured after 1986, with several exceptions that are generally administered by the ATF.  Two are relevant here.

17.    ***Machine gun "Samples" for <u>Demonstration</u> to Government Agencies.***  First, machine guns may be possessed, transferred, and imported "solely for use as a sample by a registered importer or registered dealer." 26 U.S.C. § 5844; *see also* 27 C.F.R. § 479.105(c).  To satisfy this exception, a registered importer or dealer must provide the ATF with an application containing (1) specific information as to the expected government customers who would require a demonstration of the weapon, (2) information as to the availability of the machine gun to fill subsequent orders, and (3) "letters from governmental entities expressing a need for a particular

---

[2]        For further discussion of the law on this topic, see *United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019).

model or interest in seeing a demonstration of a particular weapon." 27 C.F.R. § 479.105(d). Additionally, "[a]pplications to transfer more than one machine gun of a particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred." *Id.* ATF will approve up to two (2) machine gun samples of a particular model and caliber for possession by, transfer to, and/or importation by a particular registered importer/dealer. *See* ATF Ruling 2002-5.

18. **Machine guns _Purchased_ by Government Agencies.** Second, machine guns may be possessed by, transferred to, or imported directly by federal, state, or local government agencies. 18 U.S.C. § 922(o); 26 U.S.C. § 5844; 27 C.F.R. § 479.105(a). The government agency generally provides documentation to the registered dealer or manufacturer requesting the specific machine guns to be purchased by the agency.[3] The registered dealer or manufacturer must complete and maintain the proper ATF paperwork, which must disclose the identity of the person or entity purchasing the machine gun. 18 U.S.C. § 922(b)(5). The identity of the purchaser must be "the real buyer or intended recipient of the firearm, not a nominal or straw buyer." *See United States v. Kelerchian*, 937 F.3d at 904 (citing *Abramski v. United States*, 573 U.S. 169, 174–75 (2014)).

19. Federal law also requires importers and dealers of machine guns to keep records related to their transactions, regardless of whether for demonstration to or for purchase by a government agency. 18 U.S.C. § 923(g); 26 U.S.C. § 5843; 27 C.F.R. § 479.131. For instance, for domestic manufacturers or dealers who seek to transfer machine guns to another registered dealer as a demonstration sample, the relevant ATF paperwork is ATF Form 3. *See* 27 C.F.R. § 479.88(b). Similarly, for overseas manufacturers who export machine guns for purchase by

---

[3] *See* ATF National Firearms Act Handbook, ATF E-Publication 5320.8 (April 2009), at 206 (App'x D – Sample Form Letters), *available at* https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download

government agencies, the relevant ATF paperwork is ATF Forms 6 and 6A. *See id.* § 478.129(d). It is a crime to make, or cause to be made, false statements with respect to records either submitted to ATF or required by law to be maintained by a registered manufacturer or dealer. 18 U.S.C. §§ 1001, 924(a)(1)(A); 26 U.S.C. § 5861(l).

D. **ATF Records Show Addyston Police Department Purportedly Sought Demonstrations and Purchases of Hundreds of Machine Guns**

1. **ATF Regulators Identify Multiple Machine Gun Requests from APD**

20. In or around 2018, the regulatory arm of ATF responsible for tracking machine guns in the United States (referred to as "ATF NFA Branch") identified suspicious transactions related to MARCUM and his and his companies' multiple federal firearms licenses. Specifically, ATF NFA Branch identified approximately 39 letters that MARCUM had submitted to the ATF over approximately three-and-a-half years to acquire approximately 246 machine gun "samples" for demonstration to law enforcement. Nearly all of the letters requesting demonstrations were from APD and signed by LACOURSE as the Chief of Police.

21. On or about October 18, 2018, ATF NFA Branch contacted the mayor of Addyston, Ohio about the requests. The mayor informed NFA Branch that the village had not approved of, or budgeted for, any machine gun purchases by the APD. The mayor stated that no city funds were used to purchase the machine guns.

22. Also on or about October 18, 2018, ATF NFA Branch contacted LACOURSE. LACOURSE stated that he did in fact request demonstration of machine guns because he wanted his officers to be familiar with a wide variety of machine guns in case they encounter one.

      **2.**      **ATF Records Show APD Purportedly Sought Multiple <u>Demonstrations</u> of Machine Guns**

23.     ATF investigators analyzed records submitted to ATF NFA Branch by registered dealers MARCUM (and later PETTY) related to requests for acquisition of machine guns for purpose of demonstration to APD.  These records included the "letters from governmental entities" required by 27 C.F.R. § 479.105(d).  To date, ATF investigators have identified approximately 40 letters on APD letterhead, signed by LACOURSE, dated between approximately October 13, 2015 and September 17, 2018, requesting the demonstration of particular machine guns.

24.     The letters purported to request the demonstrations "for possible future purchase and use of our officers in the performance of their official duties."  The letters further stated that "[t]he firearms requested for demonstration are particularly suitable for use as a law enforcement weapons [sic]."  An example is below:



## Village of Addyston Police Department

*Chief Dorian D. LaCourse*

235 Main Street Addyston, Ohio 45001-0536

Office: (513) 467-3611   Fax: (513) 941-2514

www.addystonpolice.org

December 15, 2017

Re: Request for demonstration FNH USA

Mr. Johnathan Marcum
4-35-047-01-8K-04785
DBA: Marcum Firearms
18224 Marcum Lane
Laurel, In, 47024

Dear Mr. Marcum:

The Addyston, Ohio Police Department would like a demonstration of the following FN machine guns (2) *FN M249 Saw 5.56MM* , (2)FN M249 Para 5.56MM, M2HB QCB 12.7x99, FN M240L 7.62mm , SCAR 16 5.56x45mm Blk 10-in CQC , SCAR 16 5.56x45mm FDE 14-in , SCAR 17 7.62x51mm FDE 16-in, for possible future purchase and use of our officers in the performance of their official duties. The number of sworn full time officers in our department is 10. These officers are authorized by law to make arrests and carry firearms in the performance of their official duties.

The firearms requested for demonstration are particularly suitable for use as a law enforcement weapons. The personnel representing the Addyston Police Department are authorized by law to carry firearms in the performance of their official duties. The personnel representing the Addyston Police Department during the demonstration are authorized to evaluate the firearms.

If there are any questions, please contact our office.

Sincerely yours,

Chief Dorian D. LaCourse

25.     The letters requested numerous types of machine guns, including the following:

a.     The example letter shown above, signed by LACOURSE, addressed to MARCUM, and dated on or about December 15, 2017, requested demonstration of a M2HB QCB machine gun, which was delivered to MARCUM. The M2HB is a 12.7mm

11

(.50 caliber) belt-fed heavy machine gun, which is in military use, is vehicle- or ship-mounted, and is noted to be effective against infantry, unarmored or lightly armored vehicles, light fortifications, and low-flying aircraft.

      b.     A letter signed by LACOURSE, addressed to MARCUM, and dated on or about October 12, 2017, requested demonstration of four M249SAW (Squad Automatic Weapon) machine guns, of which three were delivered to MARCUM.  The M249SAW is a 5.56mm belt-fed machine gun with built-in bi-pod in military use.

      c.     A letter signed by LACOURSE, addressed to PETTY, and dated on or about May 8, 2018, requested demonstration of four SCAR-16 machine guns, of which four were delivered to PETTY.  The SCAR-16 is a fully automatic assault rifle in military use.

26.     Additionally, the letters signed by LACOURSE purported to show that APD sought a demonstration of the same types of machine guns on multiple occasions.  For example, the example letter shown above and dated on or about December 15, 2017, requested demonstration of four M249SAW belt-fed machine guns and two SCAR-16 machine guns—which, as noted in the paragraph above, were some of the same types of machine gun requested on or about October 12, 2017 and May 8, 2018, respectively.

27.     These letters sought a total of over 200 machine guns.  To date, ATF investigators have identified that approximately 70 machine guns requested for demonstration were actually transferred to MARCUM or PETTY.

**3.**     **ATF Records Show APD Purportedly <u>Purchased</u> Machine Guns on Multiple Occasions**

28.     In addition, ATF investigators analyzed records submitted to ATF NFA Branch by APD purportedly for the Department's own acquisition of machine guns.  In total, ATF

investigators have identified approximately four such acquisitions for approximately 30 machine guns.

29.     These purchases included 2 acquisitions of a total of 18 machine guns from German manufacturer Heckler & Koch ("H&K"), namely eight machine guns model MP7A1  and ten machine guns model MP7A2.  Records relating to these acquisitions included letters or purchase orders on APD letterhead and signed by LACOURSE.  Among other things, these letters stated to the effect that:

> This order is being paid for with funds that our department is authorized to use under law for acquisition of equipment . . . . These firearms will be the property of department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties.

An example is below:[4]

---

[4]     H&K often utilized U.S.-based firearms distributors to coordinate transactions with U.S. law enforcement agencies.  One such distributor is Clyde Armory Inc. in Athens, Georgia, to which this letter is addressed.



## Village of Addyston Police Department

Chief Dorian D. LaCourse

235 Main Street Addyston, Ohio 45001

Office: (513) 941-1313 Ext. 11  Fax: (513) 941-2514

www.addystonpolice.org



August 4, 2016

DEPARTMENT/AGENCY PURCHASING IMPORTED NFA FIREARMS

Mr. Andrew Clyde
Clyde Armory Inc.
4800 Atlanta Highway
Athens, GA 30606

Dear Mr. Clyde:

This is an order for __(8) MP7A1, 4.6x30mm Submachine Gun #203056-A5__ at the price of __$1784__ each, plus shipping charges, for the __Addyston Police Department__.

The number of sworn full time officers in our department is __8__ . These officers are authorized by law to make arrests and carry firearms in the performance of their official duties.

This order is being paid for with funds that our department is authorized to use under law for the acquisition of equipment (*Note: if funds of individual officers are being used to buy departmental firearms for the officers' official use, then add "including funds from individual officers who may be required to pay in whole or in part for their equipment to carry out their official duties."*). These firearms will be the property of department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties.

The telephone contact number for this department is (513) 467-3613

Enclosed is our department purchase order for these firearms.

Sincerely yours,

Dorian D. LaCourse
Chief of Police
Addyston Police Department

14

30. These purchases involved the export/import of machine guns from H&K. With the purchase order letters, APD submitted documents titled "End Use Certificate," signed by LACOURSE, which was purportedly "[f]or presentation to the Export Control Authorities of the Federal Republic of Germany." They claimed that the "end user" was the "Village of Addyston Police Department" and that the Department was "the final end-user of the goods."

31. As a result of these two purchases, H&K prepared and maintained records of the transactions as required by law. First, H&K completed ATF Form 6 (for the importation of machine guns into the United States) for each transaction stating that the "specific purpose of importation" was the importation for and sale to the Addyston Police Department. Second, H&K completed ATF Form 5 (for the transfer of machine guns to governmental entities) for each transaction stating that the "transferee" (the intended recipient of the machine guns) was the Addyston Police Department.

E.     **Interview with LACOURSE**

32. On or about March 18, 2019, LACOURSE was interviewed by ATF at APD. LACOURSE confirmed that he personally signed the approximately 40 letters that had been identified by ATF NFA Branch. When asked what MARCUM does with the letters after LACOURSE signs them, LACOURSE said he believes MARCUM "sends them in" but does not specifically know where or to whom.

33. With regard to the letters requesting demonstrations, LACOURSE stated that APD was not interested in purchasing machine guns because automatic weapons were not suitable for their needs. Rather, LACOURSE said he wanted to familiarize APD officers with the types of weapons they might come across in their duties. When asked, he stated that his officers had never come in contact with such weapons in the field. LACOURSE claimed that he did in fact

participate in demonstrations for the machine guns noted in the letters requesting demonstrations, as did some of his officers.

34.     LACOURSE was then asked specifically about APD's <u>purchases</u> of machine guns, including those from H&K.  LACOURSE stated the H&K guns were not located at APD but rather were at MARCUM's shop.  LACOURSE stated APD was in possession of several other machine guns that MARCUM paid for (but which ATF records show that APD "purchased"), which MARCUM had subsequently modified to be semi-automatic and "donated" to APD.  Regarding the H&K guns, LACOURSE stated he sent them to MARCUM so they could be modified as well, since APD did not want automatic weapons.

35.     When asked who paid for the H&K machine guns, LACOURSE stated that MARCUM did because the village council said they would not pay for them.

## F.     <u>Interviews with MARCUM</u>

### 1.     **Initial Interview**

36.     On or about March 18, 2018, just after interviewing LACOURSE, ATF investigators traveled to MARCUM's residence to interview him.

37.     During the visit, one of the ATF investigators observed in plain view MARCUM's Acquisition and Disposition (A&D) Book, which are records MARCUM was required by law to keep as a registered firearms dealer relating to his acquisition and disposition of machine guns. MARCUM's A&D Book indicated that the H&K machine guns were in MARCUM's possession because they were being "repair[ed]."

38.     The ATF investigator also observed two bottles of whiteout sitting nearby and saw whiteout on the A&D Book appearing to cover up many of the dispositions (sales to other registered dealers) of machine guns that, according to ATF records, had been purportedly

16

purchased by and registered to APD. The whiteout had dried. Written over it were notations indicating that MARCUM had transferred possession of the H&K machine guns back to the Addyston Police Department.

39.     ATF Investigators asked what was listed under the whiteout, to which MARCUM stated, "Those are the dealers that [the machine guns] went to."  MARCUM also stated that those were probably the only two places that he had used whiteout in his A&D Book.

40.     ATF investigators asked MARCUM whether he knew they were coming. He stated that LACOURSE had called him shortly before and informed him that ATF investigators might be coming to visit him and had some questions.

41.     MARCUM was also asked how the H&K machine guns were acquired. MARCUM stated that he purchased them for the Department because the village council would not allow LACOURSE to purchase them. He insinuated that they were purchased for demonstration to the Department, and that if the Department was not interested in them, he (MARCUM) could then sell them to other registered dealers to recoup his money.

### 2.     Subsequent Interviews

42.     MARCUM was interviewed several months later with counsel present. During this and later interviews, MARCUM stated that he conspired with LACOURSE and PETTY to generate false requests for demonstration and straw purchases of machine guns by APD for the purpose of obtaining post-1986 machine guns and reselling them at a profit. MARCUM stated that he often prepared the letters and sent them to LACOURSE to sign, which LACOURSE did and returned to MARCUM to use in acquiring the machine guns.

43.     Regarding the demonstrations, MARCUM stated that few, if any, of the requested demonstrations ever occurred, and that LACOURSE was well aware of this. MARCUM stated

the only "demonstration" of machine guns on full automatic occurred on or around December 10, 2018, following several inquiries by ATF NFA Branch. LACOURSE came to MARCUM's property and fired several of the machineguns that MARCUM still had on-hand that were claimed to be for "demonstration" for the Police Department. No other APD officers were present. Several months later, shortly after ATF investigators visited and interviewed LACOURSE and MARCUM, MARCUM prepared and shared with LACOURSE a document that purported to list the machineguns that were purportedly demonstrated to LACOURSE on or around December 10, 2018.

44.    MARCUM stated that LACOURSE knew the APD demonstration letters were required for registered dealers like MARCUM and PETTY to obtain post-86 machine guns. MARCUM further stated that LACOURSE also knew that, in reality, the machine guns were being acquired for resale to other registered dealers at a profit.

45.    Similarly, with regard to the machine guns purportedly purchased by APD (including the H&K machine guns), MARCUM stated that he and his co-conspirators (including LACOURSE) did not intend APD to purchase the guns for APD's use. Rather, the intent was for MARCUM to purchase the guns in APD's name and then for MARCUM and PETTY to resell them to other registered dealers at a substantial profit. MARCUM stated that he paid approximately $1,800 per H&K machine gun and resold them for approximately $7,000–$10,000 each.

46.    In addition, with regard to the non-H&K machine guns purportedly purchased by APD, MARCUM stated that he converted the guns to semi-automatic and gave them back to APD after he became concerned when ATF NFA Branch had started asking questions in late 2018.

47.    Also, MARCUM stated that he and LACOURSE prepared additional fictitious documentation to justify MARCUM's possession of the machine guns that APD had purportedly

purchased, in case ATF regulators stopped by to conduct a routine inspection. These letters falsely claimed that APD had temporarily given possession of the machine guns to MARCUM for the purpose of "fix and repair." As MARCUM and LACOURSE well knew, however, the machine guns were new and did not require fix or repair.

**G.    Records Confirm Co-Conspirators' Acquisition and Sale of Machine Guns**

48.    Records obtained throughout the investigation corroborate MARCUM's statements during the later interviews with him. For example:

a.    To date, ATF has identified ATF records showing over 70 machine guns that were purportedly purchased by APD, or purchased by MARCUM or PETTY for purported demonstration to APD, that have since been sold or transferred to other registered firearms dealers, including Mark Nylen, Carson Bachelder, DFW Shooting Sports, and the Mayday Handgun Training Range.

b.    Bank records for MARCUM show payments for the acquisition of machine guns purportedly purchased by APD or were purchased by MARCUM or PETTY for purported demonstration to APD, as well as the receipt of monies for the subsequent sales of those machine guns.

c.    Records from GunBroker.com, an online firearms marketing website, show that during the time period in which the conspiracy occurred, MARCUM advertised for sale machine guns of a type and model that had been purportedly purchased by APD or were purchased by MARCUM or PETTY for purported demonstration to APD.

**H.    Payments to LACOURSE for Machine Gun Transactions**

49.    MARCUM also stated during the later interviews that he agreed to, and did, pay LACOURSE a percentage of the proceeds from the sales of the machine guns obtained through

the demonstration letters and purchase orders LACOURSE signed. MARCUM stated that LACOURSE called the payments a "donation" to APD. However, LACOURSE asked to MARCUM to mail checks to his attention at APD and to make the checks payable to LACOURSE himself, not to APD.

50.     MARCUM provided ATF investigators with copies of 11 checks written to LACOURSE over the course of the conspiracy that totaled $11,531.80. The memo line of most of the checks contained notations such as "PD Donation" (or something similar). A chart summarizing the 11 checks is below:

| Date: | Check #: | Amount: | Payee: | Remarks: | Bank Endorsement: |
|---|---|---|---|---|---|
| 3/3/2016 | 1609 | $ 130.00 | Dorian LaCourse | PD Payment | 5/3rd Bank |
| 4/4/2016 | 1641 | $ 300.00 | Dorian LaCourse | PD Payment | 5/3rd Bank |
| 6/16/2016 | 1656 | $ 100.00 | Dorian LaCourse | PD Payment | 5/3rd Bank |
| 9/22/2016 | 1705 | $ 235.00 | Dorian LaCourse | PD Payment | 5/3rd Bank |
| 12/9/2016 | 1738 | $ 200.00 | Dorian LaCourse | PD Payment | 5/3rd Bank |
| 3/6/2017 | 1612 | $ 940.00 | Dorian LaCourse | PD Donation | 5/3rd Bank |
| 7/10/2017 | 160 | $ 1,920.00 | Dorian LaCourse | PD | 5/3rd Bank |
| 10/3/2017 | 164 | $ 1,100.00 | Dorian LaCourse | Donation | 5/3rd Bank |
| 1/3/2018 | 170 | $ 2,100.00 | Dorian LaCourse | Donation | 5/3rd Bank |
| 8/4/2018 | 81 | $ 2,846.80 | Dorian LaCourse |  | 5/3rd Bank |
| 10/23/2018 | 2037 | $ 1,660.00 | Dorian LaCourse | PD Gift | 5/3rd Bank |
|  |  |  |  |  |  |
|  |  | $11,531.80 |  |  |  |

51.     Records from 5th/3rd Bank show that, with the exception of check number 1738 for $200.00, all of the checks from MARCUM to LACOURSE were cashed. Check number 1738 was deposited into LACOURSE's personal bank account ending in -8661.

I.     **Probable Cause as to Subject Property**

   A.     **Preservation of Evidence**

52.     On or about January 31, 2020, I served federal grand jury subpoenas on the Village of Addyston and Addyston Police Department seeking production of documents related to this

investigation. Shortly thereafter, an attorney for the Village contacted the government and began gathering materials responsive to the subpoena. During that process, the Village attorney was made aware of the Subject Property and took steps to preserve it, including in the case of the Computer, voluntarily surrendering it to the ATF. The Computer is currently located at the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. The other items remain secured in the possession of the Village of Addyston.

      **B.**    **<u>Computer</u>**

53.     The Computer is owned by the Village of Addyston and was assigned to LACOURSE as his computer at APD.

54.     MARCUM informed investigators that he communicated with LACOURSE about the machinegun scheme via email, including LACOURSE's official email address at APD, dlacourse@addystonohio.org. Investigators have since reviewed MARCUM's emails. The emails included communications regarding, among other things, buying and selling machine guns, securing signed letters and purchase orders from LACOURSE, completing ATF forms for sales of the machineguns, inquiries from ATF NFA Branch, other potential sources of law enforcement demonstration requests, and payments to LACOURSE. In some instances, LACOURSE attached documents to emails relating to the scheme, suggesting that such documents existed on the Computer. Examples of relevant emails include:

        a.     On or about July 22, 2016, MARCUM emailed LACOURSE at **dlacourse@addystonohio.org** and attached a proposed "contract" between MARCUM and LACOURSE (on behalf of APD) regarding APD's purported purchase of eight machine guns from H&K. The contract stated, in part, that APD was acquiring the machine guns for "test and evaluation for possible purchase." The contract also stated that, although "[t]he Addyston Police Department is filling out the H&K purchase order," MARCUM

was in fact paying for and retaining "ownership" of the machine guns. Per the contract, APD had 30 days to evaluate the machine guns once they were received, and then if they did not purchase them, APD would allow MARCUM to sell them.

      i.     H&K records show that these eight machine guns were shipped to APD on or about January 30, 2017. On or about February 4, 2017, MARCUM posted an advertisement on GunBroker.com for one of these eight machine guns describing the gun as "brand new in box" and seeking a price of $11,000.

      ii.    During an interview, MARCUM stated that he created the contract for several reasons, including in the event that "someone" came poking around, to protect his [MARCUM's] outlay of money to purchase the machine guns, and as a backup plan in the event that LACOURSE and APD wanted to take possession of the machine guns.

      b.    On or about June 23, 2017, MARCUM exchanged emails with LACOURSE at **dlacourse@addystonohio.org** regarding the sale of one of the eight H&K machine guns paid for by MARCUM (but registered with ATF by APD). MARCUM attached a draft of an ATF Form 5 to transfer the machine gun from APD to a registered dealer in Texas. LACOURSE replied shortly thereafter with a scan of the ATF Form 5 now bearing his signature and stating, "Here you go, sir." MARCUM replied:

> Your [sic] the man. I'll have a check for you in the next few weeks. Its [sic] going to be a nice one. I have some major projects going on and have to catch up before I can get you paid. Have a great weekend bro.

Bank records show that on or about July 10, 2017, MARCUM wrote a check to LACOURSE in the amount of $1,920.00, which LACOURSE cashed on or about July 17, 2017.

22

c.     On or about April 26, 2018, ATF NFA Branch personnel emailed LACOURSE at **dlacourse@addystonohio.org** regarding ATF receiving multiple letters from APD requesting demonstration of the same model machine gun. ATF NFA Branch also informed LACOURSE that ATF will only approve two machine guns of the same model for demonstration to a police department. LACOURSE forwarded the email to MARCUM and stated, "We have a problem?"

    i.     On or about April 27, 2018, MARCUM emailed LACOURSE at **dlacourse@addystonohio.org** a draft of a response for LACOURSE to send back to the ATF NFA Branch personnel, which stated that the demonstration requests were legitimate and that multiple machine guns were needed because multiple officers would be firing numerous rounds through the guns during the demonstration, which caused the guns to become hot and pose safety concerns.

    ii.     On or about April 29, 2018, LACOURSE sent an email via **dlacourse@addystonohio.org** to MARCUM and PETTY, which referenced the recent communication from ATF NFA Branch and stated in part:

> I think with this letter, we have diffently [sic] over stepped our reasons for these requests. I did not sleep well last night and I do not like the idea of worrying about this type of stuff. I think worry, if they ever did a study, is a cause of a lot of health issues…I think we need to cancel this order or pull it back to what [ATF NFA Branch personnel] has said to one or two per caliber. I know we want to drive our business and take care of our families, but I don't think we need to do it in a way that will bring a cloud of impropriety to our names. I think also it may be better for you all to find another department to go through, not that I don't want to help but, to throw any suspicious activity they think we may be up to away from us. I know we are not doing anything wrong, but I am thinking they think we are.

d.     On or about May 9, 2018, LACOURSE sent an email via **dlacourse@addystonohio.org** to MARCUM and attached approximately 12 letters on

23

APD letterhead signed by LACOURSE requesting demonstrations of approximately 30 machine guns. Ten of the letters were addressed to MARCUM's entities, and two were addressed to PETTY's. In the text of the email, LACOURSE wrote: "Hopefully these all don't hit the ATF at the same time. Check each and make sure I did them right."

      e.      Or on about May 3, 2019, LACOURSE sent an email to MARCUM via **dlacourse@addystonohio.org** attaching an ATF Form 5 signed by LACOURSE, and approved by ATF NFA Branch, approving the transfer of an H&K machine gun from APD to Carson Bachelder of Michigan. In the text of the email, LACOURSE stated, "Another one gone."

55.      In light of LACOURSE's use of Addyston email and attachments in furtherance of the machinegun scheme, I submit that there is probable cause to search the Computer for such evidence, as further described in Attachment B-1.

### B.      Locker and Container in LACOURSE's APD Office

56.      On or about February 21, 2020, the Village of Addyston voluntarily surrendered several items associated with this investigation, including the Computer. In addition, the Village surrendered four FN P90 USG machineguns that were found inside the Locker, which was LACOURSE's personal locker at the police department. As noted above, these machineguns were been paid for by MARCUM but were purported to ATF as purchased by APD, and following contact with ATF in 2018, MARCUM converted the guns to semi-automatic and gave them to the APD (via LACOURSE).

57.      Additionally, the Village of Addyston voluntarily surrendered $6,094.64 in cash in response to the above-referenced federal grand jury subpoenas issued to APD and the Village, which included requests for documents relating to donations and cash.

24

58.     Furthermore, based on my knowledge, training, and experience, I know that people involved with the firearms industry tend to receive and maintain firearm acquisition and disposition records, invoices, ATF Forms, and other paperwork associated with the purchase and sale of machineguns, as required by federal law.  Further, I know that people involved in the unlawful trafficking of machineguns usually maintain records, receipts, notes, ledgers, and other paperwork relating to the purchase and sale of machineguns.  Further, I know that people involved in the unlawful trafficking of machineguns often conceal their possession of proceeds of such trafficking, particularly cash, in their residences, businesses, and automobiles, including and particularly in locked containers in such locations.

59.     In light of such background and that machineguns procured through the above-described scheme were located in the Locker, I submit that there is probable cause to search the Locker for additional evidence, instrumentalities, or fruits of the machinegun scheme, as further described in Attachment B-3.

60.     Further, in light of such background and evidence of the crime being located in LACOURSE's office, LACOURSE's cashing of MARCUM's checks to him related to the machinegun scheme, and the Village's response to the grand jury subpoena including $6,094.64 in cash, I submit that there is probable cause to search the Container for additional evidence, instrumentalities, or fruits of the machinegun scheme, as further described in Attachment B-3.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

61.     Based on my knowledge, training, and experience, I know that electronic devices, including the Computer, can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

25

62.     With regard to traditional computers, such as the Computer, I know based on my knowledge, training, and experience that things that were once stored on such devices may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

26

      d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

63.    ***Forensic evidence.***  As further described in Attachments B-1 through B-3, this Application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how any electronic device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on such electronic devices, including the Computer, because:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

64.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

65.     I submit that this affidavit supports probable cause for search warrants authorizing the search of the Subject Property described in Attachments A-1 through A-3 to seek the items described in Attachments B-1 through B-3.

## REQUEST FOR SEALING

66.     Because this investigation is ongoing, disclosure of the search warrant would seriously jeopardize the investigation by providing targets an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution.  This is particularly true here, where as described above, one co-conspirator has provided law enforcement inculpatory information relating to another co-conspirator.  Therefore, I respectfully request the Court to seal the Search Warrants, Affidavit in support of application for search warrant, Application for search warrant, and all attachments thereto until further order of this Court.

_____
Stephen Tastle, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Subscribed and sworn to before me this ___16th___ day of March, 2020.

_____
Stephanie K. Bowman
United States Magistrate Judge
Southern District of Ohio

29

**ATTACHMENT A-1**
**Property to Be Searched**

The Property to be Searched is a Lenovo Desktop Computer, black in color, with serial number ES13460294, and the physical and digital contents thereof, which was voluntarily surrendered to the Bureau of Alcohol, Tobacco, Firearms, and Explosives by the Village of Addyston, Ohio, and is presently in the custody of the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. A photograph is provided below.




**ATTACHMENT B-1**
**Particular Things to be Seized**

Special Agent Stephen Tastle, assisted by any Federal, State or local law enforcement agencies deemed necessary, is authorized to search for and seize the following items contained in the Property to be Searched, described in Attachment A-1, relating in any manner to or as evidence, instrumentalities, or fruits of violations of 18 U.S.C §§ 371 (conspiracy), 924(a)(1)(A) (false statements in records related to firearms), and 1001 (false statements to the government).

## Definitions

**Document**" or "**Record**" means every writing or record of whatever type or description, including but not limited to any material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form, including but not limited to emails, text messages, memoranda, letters, forms, reports, notations of any sort of conversations, messages, pictures, videos, voice recordings, voicemail, calendars, date books, call logs, and chat logs, including their metadata and any deleted but recoverable electronic files.

"**Communication**" means any transmission or exchange of information between two or more persons orally, in writing, or electronically and includes, without limitations, any conversation or discussion, whether face-to-face or by means of telephone, electronic (including email, text messaging, instant messaging, social media messaging, direct messaging), or other media, whether by chance or by design.

## Items to be Seized

The Items to be Seized are the following items, regardless of whether found in physical or digital form:

1

1. Any and all records relating to purchases, sales, transfers, repairs, loans, demonstrations, and any other transactions involving machine guns[5], including but not limited to:

   a. Copies of all acquisition and disposition records to include make, model, serial numbers, caliber of machine guns and associated paperwork to include, but not limited to law letters, repair letters, gunsmith requests and ATF Forms of the transferred machine guns.

   b. Copies of all letters requesting demonstration of machine guns

   c. Copies of all invoices, purchase orders, sales receipts, and/or journal entries

   d. Copies of all shipping invoices, bills of lading, and/or inventory records

   e. Documentation of all payment remittances including negotiated checks, debit memos, credit card identifications, money orders, wire transfers, cash receipts, other items of value (to include firearms, ammunition, etc) or other supporting receipt/disbursement journal entries

   f. Communications and records of communications relating to any purchases, sales, transfers, repairs, loans, demonstrations, and any other transactions involving machine guns

   g. Calendars, diaries, or other records relating to the demonstration of machine guns

   h. Records that are or relate to budgets, ledgers, financing authority, plans, policies, or approvals for purchases of machine guns

   i. Records relating to the proceeds of sales of machine guns

2. Any and all communications and records of communications to, from, or involving any current or former supervisors, managers, officers, or employees of the Addyston Police Department (including part-time or reserve officers and employees) with or relating to the following:

   a. Machine guns

   b. Johnathan Paul Marcum, and any entities related to Marcum, including but not limited to Marcum Firearms, Marcum Manufacturing, and Police Supply Armory

   c. Christopher William Petty, and any entities related to Petty, including but not limited to Tri-State Guns and Customs Works and Tri State Firearms LLC

---

[5] Machine guns are "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 27 C.F.R. § 479.11.

     d.   U.S. Bureau of Alcohol Tobacco Firearms and Explosives

     e.   Heckler and Koch Firearms (H&K)

     f.   FN America LLC (FNH USA/FN)

     g.   Mark Nylen

     h.   Clyde's Armory

3. Any and all records relating to any and all financial transactions, cash, gifts and donations of anything of value to, from, or involving the following:

     a.   Johnathan Paul Marcum, and any entities related to Marcum, including but not limited to Marcum Firearms, Marcum Manufacturing, and Police Supply Armory

     b.   Christopher William Petty, and any entities related to Petty, including but not limited to Tri-State Guns and Customs Works and Tri State Firearms LLC

4. Any and all records relating to cash, gifts, and donations of anything of value from Dorian Lacourse.

5. Any and all records relating to "petty cash" or other cash maintained on-hand at the Addyston Police Department.

6. Evidence of user attribution showing who used or owned the Property to be Searched described in Attachment A-1 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3